AO 106 (Rev. 04/010) Application for Search Warrant          AUTHORIZED AND APPROVED/DATE: _____ 4/6/18

# UNITED STATES DISTRICT COURT
### for the
_____ WESTERN _____ DISTRICT OF _____ OKLAHOMA

**FILED**

APR 6 2018

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT, WESTERN DIST. OKLA
BY_____, DEPUTY

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be search* | ) |
| *Or identify the person by name and address)* | ) |
| Premises known as | )   Case No: M-18- 204 -P |
| 7313 NW 125th | ) |
| Oklahoma City, OK 73142 | ) |
| And any outbuildings, or vehicles within the | ) |
| curtilage of the residence. | ) |

## APPLICATION FOR SEARCH WARRANT

I, a federal law enforcement officer or attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following property *(identify the person or describe property to be searched and give its location)*:

7313 NW 125th, Oklahoma City, OK 73142, in Walnut Creek Estates, Oklahoma City, Oklahoma County, Oklahoma (shown in Attachment A) and any outbuildings, or vehicles within the curtilage of the residence.

Located in the Western District of Oklahoma, there is now concealed *(identify the person or describe the property to be seized)*:

See also Attachment B, which is attached and incorporated by reference..

The basis for the search under Fed. R. Crim.P.41(c) is *(check one or more)*:
- ☒ evidence of the crime;
- ☒ contraband, fruits of crime, or other items illegally possessed;
- ☒ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1343 | Wire Fraud |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1028(c)(7) | Identity Theft |
| 18 U.S.C. § 371 | Conspiracy to commit Identity Theft |
| 18 U.S.C. § 1028A | Aggravated Identity Theft; and |
| 18 U.S.C. § 371 | Conspiracy to commit Aggravated Identity Theft |

The application is based on these facts:

See attached Affidavit of Special Agent Kimberly Carter, United States Secret Service, which is incorporated by reference herein.

        ☒     Continued on the attached sheet(s).
        ☐     Delayed notice of [No. of Days]   days *(give exact ending date if more than 30 days)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet(s).

_____
*Applicant's signature*

Kimberly Carter
Special Agent
United States Secret Service

Sworn to before me and signed in my presence.

Date: ___4/6/18_____

_____
*Judge's signature*

City and State:  Oklahoma City, Oklahoma

Gary M. Purcell, U.S. Magistrate Judge
*Printed name and title*



7313 NW 125th Street, Oklahoma City, OK 73142

Lot twenty-eight (28) of block three (3) in Walnut Creek Estates, Oklahoma City, Oklahoma County, Oklahoma

This property consists of a single story single family residence built in the year 1983 with 1499 square feet of living space with an attached garage located on the north side of 125th street.

ATTACHMENT A

# ATTACHMENT B

1. Any and all documents, whether in physical or electronic form, pertaining to real property ownership, possession, attempted possession, sale, rental or other real property transaction, inquiry or correspondence, including but not limited to:

   (a) Deeds, mortgages, notes, property descriptions, appraisals, title transfers, contracts, bills of sale, affidavits, loan applications, tax documents, insurance documents, liens, lien releases, disclosure statements, or any other closing documents;

   (b) Internet property searches or search history, photographs, notary seals, notary signatures, documents bearing seals and/or signatures of notaries, scanned or saved electronic images bearing seals and/or signatures of notaries;

   (c) Eviction notices or any court record, county record or other document pertaining to eviction or eviction efforts;

   (d) Receipts, correspondence, or other documents pertaining to property transactions or inquiries involving a court clerk, county assessor, county clerk, or other government agency including tax auctions, delinquent tax notices, delinquent tax affidavits, receipts of delinquent tax payment, filing fees, recording fees, receipts for services, confidential documentary stamp tax records;

   (e) Estimates, receipts, work orders, records of payments, payment instruments (such as check, cashier's check, wire transfer, or any other form of money transfer), or other documents pertaining to work done, bid, solicited or contemplated by contractors, vendors, or suppliers;

   (f) Correspondence related to the purchase, sale, title transfer, or rental of property and associated envelopes, boxes, receipts, address labels, address books, tracking numbers, return receipt cards, invoices,



receipts, waybills, airbills, or any other document showing sending or receipt of items by US mail or private carrier;

(g) Any document pertaining to the rental or lease of any mailbox;

2. Wills, Powers of Attorney or any other document that transferred or attempted to transfer ownership, control or authority over any person, property or transaction.

3. All documents, whether in physical or electronic form, pertaining to court proceedings, including pleadings, affidavits, exhibits, depositions, correspondence, settlement offers or agreements.

4. All banking and financial records and instruments, including but not limited to business accounts, personal accounts, checks, deposits, cashier's checks, certified checks, automated clearinghouse transactions, money orders, MoneyGrams, any prepaid card records, wire transfers, credit or debit card receipts, credit card accounts, ATM receipts, account statements, loan documents, safety deposit box records, brokerage account records, tax returns, draft tax returns, tax return supporting documents.

5. Any mail found in the home that is not in the name of Cheryl Ashley or George Ashley residing in the home.

6. Any computer, computer hardware, or other digital media storage device, consisting of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data, that can contain files within the scope of the warrant. "Hardware" includes, but is not limited to, any data-processing devices (such as central processing units, self-contained "laptop" or "notebook" computers, "Palm Pilots" or any other type of Personal Digital Assistant, iPods, cellular telephones, memory facsimile machines and "schedulers"); internal and peripheral storage devices (such as fixed disks, external hard drives, USB storage devices, optical storage devices, CD and DVD devices, thumb drives and any other storage device); peripheral input/output devices (such as keyboards, printers, scanners, video display monitors, mouse devices); and related communications devices (such as modems,



cables and connections, recording equipment, RAM or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

7. Any physical keys, encryption devices, dongles, and similar physical items used to access any digital device or data stored on the digital device; any password, password files, electronic keys, encryption codes, or any other information necessary to access the digital device or data stored on the digital device.

8. Cellular or internet telephones, call logs, contact lists, voice mails, text messages, email, or any other form of electronic voice or data communication, internet history, saved internet bookmarks.

9. Any other items that are evidence, fruits or instrumentalities of violations of the following statues from 2014 to present:

> 18 U.S.C. § 1341 (mail fraud);
> 18 U.S.C. § 1343 (wire fraud);
> 18 U.S.C. § 1344 (bank fraud);
> 18 U.S.C. § 1957 (money laundering);
> 18 U.S.C. § 1028 (c)(7) (identity theft)
> 18 U.S.C. § 371 (conspiracy to commit identity theft);
> 18 U.S.C. § 1028A (aggravated identity theft); and
> 18 U.S.C. § 371 (conspiracy to commit aggravated identity theft)

10. Any and all documents or items identifying persons who have dominion and control over the premises searched, including any home security video;



## AFFIDAVIT

1.      I, Kimberly Carter, am a Special Agent employed by the United States Secret Service (Secret Service).  I have been employed by the Secret Service for over 20 years.  I am currently assigned to the Oklahoma City office of the Secret Service where I am responsible for the investigation of Title 18, United States Code, offenses including white collar criminal offenses.

2.      As a Secret Service agent, I have conducted numerous criminal investigations, assisted in the execution of search and arrest warrants, conducted physical surveillance, analyzed records, and interviewed witnesses as well as suspects.  The facts and information set forth in this affidavit are derived from an investigation conducted by the Secret Service and the Consumer Protection Unit of the Oklahoma Attorney General's Office.

3.      Because this affidavit is being submitted for the limited purpose of establishing probable cause, I have not included each and every fact known to investigators. I have set forth only the facts that I believe are necessary to establish probable cause to support the issuance of a search warrant.

4.      This affidavit is offered in support of an application for a search warrant in the Western District of Oklahoma at the below address:

**7313 N.W. 125th Street**
**Oklahoma City, 73142**

5.      Based upon the information contained in this affidavit, I submit that

probable cause exists to believe that:

a.      One or more persons, including Cheryl Ashley, Laura R. Johnson and Thomas C. Johnson, Sr., have devised a scheme to defraud and to obtain money and property by means of false or fraudulent representations and have knowingly executed and caused the execution of the scheme through the use of the United States mail in violation of Title 18, United States Code, Section 1341;

b.      One or more persons, including Cheryl Ashley, Laura R. Johnson and Thomas C. Johnson, Sr., have devised a scheme to defraud and to obtain money and property by means of false or fraudulent representations and have knowingly caused the wire transmission of documents in interstate commerce in violation of Title 18,     United States Code, Section 1343;

c.      One or more persons, including Cheryl Ashley, Laura R. Johnson and Thomas C. Johnson, Sr., have knowingly transferred, possessed or used, without lawful authority, a means of identification of another person with the intent to commit or aid and abet in the commission of a federal offense of mail fraud and/or wire fraud, or a State of Oklahoma offense of procuring or offering a false instrument to be filed in a public office (21 OSA 463), in violation of Title 18, United States Code, Section 1028(a)(7);

d.      Two or more persons, including Cheryl Ashley, Laura R. Johnson and Thomas C. Johnson, Sr., have knowingly conspired in violation of Title 18, United States Code, Section 371, to transfer, possess or use, without lawful authority, a means of identification of another person with the intent to commit or aid and abet in the commission of a federal offense of mail fraud and/or wire fraud, or a State of Oklahoma offense of procuring or offering a false instrument to be filed in a public office (21 OSA 463), in violation of Title 18, United States Code, Section 1028(a)(7);

e.      One or more persons, including Cheryl Ashley, Laura R. Johnson and Thomas C. Johnson, Sr., knowingly transferred, possessed or used, without lawful authority, a means of identification of another person

2

to commit mail fraud, wire fraud or bank fraud under Title 18, United States Code, Section 1028A.

f.      Two or more persons, including Cheryl Ashley, Laura R. Johnson and Thomas C. Johnson, Sr., knowingly conspired in violation of Title 18, United States Code, Section 371, to transfer, possess or use, without lawful authority, a means of identification of another person to commit mail fraud, wire fraud or bank fraud under Title 18, United States Code, Section 1028A.

## SUMMARY OF INVESTIGATION

6.      The United States Secret Service and the Consumer Protection Unit of the Oklahoma Attorney General's Office are conducting a criminal investigation of individuals who have fraudulently obtained and attempted to obtain title to real properties located in the Western District of Oklahoma through the use of forged warranty and quit claim deeds, forged documents, forged notaries' signatures and seals, as well as false eviction notices. At this time, I have identified at least 15 properties that appear to have been targeted for takeover in this warranty deed fraud. I do not represent these are the only homes targeted by individuals involved in this warranty deed fraud as there may well be other properties that have not yet been identified.

7.      Delinquent property taxes were owed on many of the properties. Individuals involved in this fraud appear to target such properties, pay at least one year of the back taxes, create and file forged deeds and then claim to have purchased the properties through county tax auctions. However, investigators have determined the properties fraudulently taken over by individuals in this fraud have not been auctioned by county officials for delinquent taxes. Additionally, I know that Cheryl Ashley and her daughter Laura R. Johnson are aware of the actual procedures used by county officials to auction properties.

3

In fact, both women have successfully bid on properties auctioned by Oklahoma County. In addition to properties owing delinquent property taxes, at least one property targeted by these individuals had been involved in a foreclosure suit.

8.     During the course of this investigation, another investigator and I have examined numerous deeds and court documents and have spoken with some homeowners or their lawyers regarding the fraudulent actions taken against their properties. The property owners and lawyers who have been interviewed stated the owners had not signed the deeds transferring their properties and that their names had been forged.

9.     I believe the signatures and seals of numerous notaries have been forged or fraudulently scanned onto these deeds to give the appearance of a legitimate title transaction. Not all notaries, whose names appear on these documents, have been interviewed. However, 10 notaries have been interviewed and have stated that the seals and signatures on the deeds and on other documents are not their own and that they had not notarized the documents. A lawyer for a company that employs one notary, whose signature and seal appears on two documents, advised an investigator that the notary notarized one document but a second document with her notary seal and signature was a forgery.

10.     In some cases, individuals involved in this warranty deed fraud have successfully taken over properties. For example, Dru Hayhurst received a notice from the Oklahoma Treasurer's Office that unless he paid delinquent property taxes on his home at 2728 Cambridge Court in Oklahoma City, the county would auction the property to pay back taxes. Hayhurst immediately paid all of the back taxes on line. After payment of his

4

property taxes, Hayhurst received a false eviction notice purportedly signed by former

Oklahoma County Sheriff John Whetsel. Hayhurst believed he had been too late in paying

the delinquent taxes and simply walked away from his home when he received the eviction

notice. Hayhurst's home had been completely paid off. On February 23, 2017, a warranty

deed allegedly signed by Hayhurst on August 2, 2016, transferring his home to OT LLC

was filed with the Oklahoma County Clerk's Office. Hayhurst stated he did not sign any

deed transferring his property.

11.    Some homeowners, whose property was affected by this fraud, hired

attorneys to file quiet title actions in the Oklahoma district courts. The individuals involved

in this warranty deed scam have fought those quiet title actions. One example involves the

attempted takeover of a home located in Oklahoma County and owned by Lucinda

Giovanni, who at the time resided in California.

### The Attempted Takeover of Lucinda Giovanni's Home
### 10204 Major Avenue, The Village

12.    In 2016, Lucinda Giovanni lived in California but owned a home at 10204

Major Avenue in the Village, located in Oklahoma County. In 2016, Giovanni received a

notice from the Oklahoma County Treasurer's Office that her home would be put up for

auction due to delinquent taxes.

13.    Giovanni contacted a friend, Norma Funston, who paid the 2012 property

taxes on the home in May of 2016. A county employee told Funston the property would

not be auctioned because of the payment of the 2012 taxes. Giovanni's  brother,  Bruce

Ball, who lives in Oklahoma City, periodically checked on the home. In June of 2016, Ball

met a man who identified himself as Keith Burkhart standing near the door to Giovanni's home. Burkhart asked Ball if he was the locksmith.

14.    Burkhart said he represented a Las Vegas company called Help and Hope that had purchased the home at a tax sale. Funston arrived at the home, showed the man the receipt of her payment for the 2012 delinquent taxes and told him the Treasurer's Office stated the home would be withdrawn from the tax sale. Burkhart refused to provide any contact information for Help and Hope.

15.    Funston re-contacted the Treasurer's office which confirmed the house had been withdrawn from the auction. Funston was also told that someone else had paid the 2013, 2014 and 2015 property taxes on the home. Oklahoma County Treasurer's Office records show that in June 2016, a company called Help and Hope LLC, 10252 Highland Gardens Drive in North Las Vegas, Nevada had paid delinquent taxes for those three years.

16.    Giovanni subsequently received a letter from Help and Hope LLC in the mail at her California address. The letter claimed Help and Hope had purchased her home at a tax sale but would sell it back to her for $13,500. The letter was signed by "Nia Forte" and listed a phone number of (405) 234-6151 and an email address of niaforte360@gmail.com. If Giovanni didn't want to buy back her property, the letter stated she could sign an enclosed warranty deed form transferring the property to Help and Hope LLC and return it to Forte. Giovanni did not accept either option. Your affiant has reviewed a copy of the letter and the warranty deed form sent to Giovanni.

### The Takeover of Lucinda Giovanni's Home
### 10204 Major Avenue, The Village

17.     On April 17, 2017, approximately ten months after Giovanni received the letter from Help and Hope LLC, a warranty deed allegedly signed by Giovanni on June 12, 2016, was filed with the Oklahoma County Clerk's Office. The deed purportedly conveyed the home at 10204 Major Avenue, from Giovanni to OT LLC. The deed shows Giovanni's signature was notarized by Deborah Abbott, who is a licensed notary in Oklahoma. After reviewing this deed, Giovanni stated the signature on the warranty deed was a forgery and that she did not convey her home to anyone. Abbott also reviewed this deed and stated she did not sign or notarize the warranty deed nor did she place her seal on the document.

18.     On June 27, 2017, a second warranty deed on Giovanni's property was filed with the Oklahoma County Clerk's Office. This deed purports to have been signed on February 12, 2017, by "Arianna Jones" as a managing member of OT LLC, and transferred the property to Helping Hand LLC.

19.     Additionally, on June 27, 2017, a mortgage between "The Texas Bank" and Helping Hand LLC was filed on Giovanni's home at 10204 Major Avenue. The mortgage document listed the address of the Texas Bank as being 5830 NW Expressway #178, Oklahoma City, OK 73132, which is a private postal box at a UPS store. This UPS box was opened on June 27, 2017, by Cheryl Ashley. The name of the corporation listed on this form is Helping Hand LLC.

7

20.     During the course of this investigation, a representative of The Texas Bank stated the bank had no interest in Giovanni's property, did not have a physical presence in Oklahoma, nor did it receive mail at 5830 NW Expressway #178.

### The Quiet Title Court Case
### 10204 Major Avenue, The Village

21.     A quiet title civil lawsuit was filed by Giovanni on June 30, 2017, in Oklahoma County District Court.  The lawsuit lasted several months and resulted in a journal entry of judgment for Giovanni on November 17, 2017, against all defendants including OT LLC, Helping Hand LLC and Arianna Jones.

22.     During the course of the lawsuit, a Special Entry of Appearance and Motion to Dismiss was filed July 17, 2017, on behalf of the defendants by The Crossanall Firm and signed by George Crossanall, #21895, of 208 Fountainview Drive, Euless Texas.  In the pleading, Crossanall claimed OT LLC legally obtained Giovanni's home after suing her in small claims court in California where it won a judgment of $32,248.52 against her. Crossanall attached "Exhibit A," entitled "SC-200 Notice of Entry of Judgment" which he represented to be the small claims judgment against Giovanni and in favor of OT LLC.

23.     I believe this document is fictitious.  First, Giovanni has stated she was never the subject of such small claims lawsuit.  Second, several areas on the California small claims judgment, marked "Exhibit A," have been "blacked out" including the case number for the lawsuit.   Third, the website for the California court system provides general information about suing in small claims court.  Specifically "SC-100-Info" provides information for a small claims plaintiff including the fact that a small claims court in

California cannot award a judgment for more than $5,000 to a business. Furthermore, if a business files a claim for more than the maximum allowable amount, it gives up the right to collect any amount over the $5,000 limit. Fourth, the California court form, "SC-200 Notice of Entry of Judgment" is an interactive form that can be accessed electronically through the Internet, filled out on line and printed. Finally, both the Texas Bar Association and the Oklahoma Bar Association have confirmed that George Crossanall is not a licensed attorney in either Texas or Oklahoma.

24.     Giovanni's quiet title lawsuit was successful as the district court judge found the deeds conveying the property were forgeries and vacated the mortgage.

### Jewel Marvine Bartrug
### 5636 NW 58th Terrace, Warr Acres

25.     In at least one case, a home involved in this warranty deed fraud, was taken over four years after the homeowner had died. Jewel Marvine Bartrug and her husband purchased their home at 5636 NW 58th Terrace in Warr Acres in 1981. Bartrug remained in the home after her husband died until her death in June 2012.

26.     Bartrug was discovered dead in her home on June 24, 2012, by a neighbor checking on her welfare. Her body was transported to the Oklahoma County Medical Examiner's Office where it remained unclaimed. On August 16, 2012, the medical examiner's office released Bartrug's body to Demuth Funeral Home where she was cremated on August 22, 2012.

27.     After Bartrug's death, the property taxes on her home became delinquent. Oklahoma County records show the 2011 back taxes on Bartrug's property were paid in

cash on June 5, 2015.  Payment for delinquent taxes for 2012 through 2014 were made on June 22, 2015 using Money Grams.

28.     I believe Laura R. Johnson and her husband, Thomas C. Johnson Sr., gained entry into Bartrug's home no later than in July of 2016, based upon their accessing Bartrug's three bank accounts at MidFirst Bank where she had approximately $170,000. On July 25, 2016, Thomas C. Johnson Sr., deposited an $8,000 check signed "Marvine Bartrug" and drawn on her MidFirst Bank account x6767 into his Showtech Distributors (Showtech) account x3701 at the Bank of Oklahoma (BOK).  The next day he deposited a $22,000 check signed "Marvine Bartrug" and drawn on the same MidFirst Bank account into his Showtech account.   Both checks were made payable to Help and Hope.  Prior to the deposit of the two Bartrug checks, the Showtech account had a balance of $320.57.

29.     Although both checks were returned by MidFirst Bank to the Bank of Oklahoma, Thomas C. Johnson Sr., had already withdrawn approximately $23,000 from the Showtech account.  When contacted by a BOK investigator about the checks, Thomas C. Johnson Sr., said Bartrug had written the checks for equipment she purchased for her church.  Only after the BOK investigator confronted him with Laura R. Johnson's use of a power of attorney for Bartrug, did Thomas C. Johnson Sr., admit he knew Bartrug was dead when he presented the checks with Bartrug's purported signature.

30.     In July of 2016, Laura R. Johnson went to MidFirst Bank where she presented a Power of Attorney form supposedly signed by Bartrug that gave Johnson power to handle Bartrug's affairs.  MidFirst Bank required a power of attorney checklist be filled

out that described the purpose for the withdrawal and why Bartrug was unable to perform the transaction herself.

31.     Laura R. Johnson stated she needed $10,000 to fix Bartrug's teeth and that Bartrug wanted to prepay Help and Hope LLC for up to two years of care. She also stated that Bartrug could not perform this financial action on her own because she "is physically fragile." Bartrug died in June 2012.

32.     Laura R. Johnson and Thomas C. Johnson Sr., continued to cause money to be withdrawn from Bartrug's accounts at MidFirst Bank. Approximately $75,000 was withdrawn between July 19, 2016 and October 17, 2016 for the benefit of the Johnsons. These withdrawals included two separate automated clearing house (ACH) withdrawals of $10,962.24 paid towards the Johnsons' home mortgage and three ACH transactions totaling over $16,000 for payment on a Discover account for Thomas C. Johnson Sr.

33.     The Oklahoma County Clerk's Office records show two transactions recorded on Bartrug's home on October 25, 2016. First, an "Affidavit of Surviving Joint Tenant" allegedly signed on January 4, 2012, by Laura R. Johnson, as attorney in fact for Bartrug, was filed at 8:06:29 a.m. on October 25, 2016. This document allegedly was notarized by Kathy Griffith, who is a licensed notary in Oklahoma. Griffith has reviewed this document and told investigators she did not sign or notarize this document.

34.     Second, a warranty deed allegedly signed on May 11, 2012 by Laura Renee Johnson, as attorney in fact for Bartrug, transferring the property to Innovative Transformations Inc., was filed at 8:06:30 a.m. on October 25, 2016. This document shows Laura Renee Johnson's signature was notarized by Tracy Putman, who is a licensed notary

in Oklahoma. Putman has reviewed this document and told investigators she did not sign or notarize this document.

35.    On November 8, 2017, a warranty deed allegedly signed July 18, 2016, by an officer of Innovative Transformations Inc., transferred Bartrug's home to the Family Heritage Trust. This deed was filed with the Oklahoma County Clerk's Office on November 8, 2017.

36.    The October 25, 2016, title transactions occurred approximately two weeks after Bartrug's nephew, Charles Bartrug, filed a petition to handle his deceased aunt's estate on October 7, 2016, in Oklahoma County probate court. On November 1, 2016, Laura R. Johnson contested Charles Bartrug's request to handle the estate, claiming she possessed the "Last Will and Testament of Jewel M. Bartrug," which left the entire estate to her.

37.    I believe the "Last Will and Testament of Jewel M. Bartrug" is a fraudulent document. First, this Last Will allegedly signed by Bartrug on January 4, 2012, and witnessed by "Nia Forte" and "Keith Barrett," purports to have been notarized on that same date by Kathy Griffith. Griffith reviewed this document and stated she did not sign or notarize the document.

38.    Second, in July of 2016, Laura R. Johnson represented to MidFirst Bank that she needed to withdraw money from Bartrug's bank accounts to fix Bartrug's teeth and to pay for ongoing care by Help and Hope over the next two years. She also told MidFirst bank that Bartrug could not conduct the withdrawals herself because she "is physically

fragile" which clearly represented that Bartrug was alive in 2016, when in fact she died in 2012.

39.     Third, Nia Forte is a name used elsewhere in this fraudulent warranty deed scheme. Specifically, Forte is the representative of Help and Hope who sent a letter to Giovanni offering to allow Giovanni to pay $13,500 to buy her home back. In that letter to Giovanni, Forte listed her phone number as (405) 234-6151. This telephone number is associated with a Verizon prepaid telephone number activated on June 15, 2016, in the name of Jewel Bartrug, who died nearly four years earlier.

40.     Fourth, Renew Contractors LLC, on July 6, 2016, filed a "notice of interest" against Giovanni in her quiet title lawsuit and listed (405) 234-6151 as the company's phone number.

41.     Finally, the name "Keith Barrett" appears on a number of documents, as an agent for Enginuity LLC, a Nevada company associated with Thomas C. Johnson, Sr. In documents filed in an unrelated matter, Johnson is listed as the CIO for Enginuity and lists the address of 8033 NW 124th, Oklahoma City, which is the home of Laura Johnson and Thomas C. Johnson Sr.

42.     Eventually, Charles Bartrug dismissed his petition in probate court.

**Bruce Willson**
**10407 Ridgeview Drive, The Village**

43.     I am aware that the Village Police Department became involved in an investigation of an attempted property takeover of the home of Bruce Willson in the Village by individuals in this warranty deed fraud. On July 20, 2017, Village Police officers

responded to a call regarding individuals who claimed to have purchased Willson's home and were attempting to make him leave.  Willson told the police officers a deed had been filed transferring his property but that he had not signed such a deed.

44.     Lt. B. South spoke with a woman who identified herself as "Carol Mary Ashton" and stated she worked for a company that purchased the house.  "Ashton" stated she was there to clean up the yard so that it could be sold.  When asked the name of the company, "Ashton" stated she couldn't remember the name because she worked for five different companies.  "Ashton" later changed her story stating she had paid the back taxes on the house which was part of the deal when she bought the house.  "Ashton" was unable to produce any identification but did give her telephone number as (405) 388-0683.  Village police later identified this phone number as belonging to Cheryl Mary Ashley.

45.     Lt. Smith was aware of an ongoing mortgage fraud scheme in the Village and contacted Village Police Detective Frazier to discuss the case.  While Lt. Smith was on the phone with Frazier, "Ashton," an adult male and two children drove away from the home. Through public records, Village police determined the woman was Cheryl M. Ashley and the adult male who had been at the home was Cheryl Ashley's son, Raymond Michael Ashley.

### Janice and Joe Shorter
### 8825 Parkridge Terrace, Oklahoma City

46.     On January 27, 2014, the Mortgage Clearing Corporation filed a foreclosure action against Janice and Joe Shorter because they had defaulted on a promissory note on the home. The Shorters had moved into a nursing home due to strokes suffered by Joe

14

Shorter.   On April 30, 2014, a journal entry of judgment in the total amount of approximately $13,000 plus interest was entered against the Shorters. A sheriff's sale was ordered to pay off the judgment and to place any amount in excess of the judgment into the Court Clerk's Office fund until further order.

47.   On July 22, 2014, the Shorters' home appraised for $110,000. At the November 11, 2014 sheriff's sale, Cheryl Ashley submitted the highest bid of $77,000 which was accepted. On September 12, 2014, Oklahoma County Court Clerk records show that Cheryl Ashley deposited $3,000 and an entity called Parkridge LLC deposited $4,700 into the Court Clerk's office for the property.

48.   The hearing to confirm the sale of the Shorters' home to Cheryl Ashley was scheduled for October 3, 2014. Cheryl Ashley failed to appear at the hearing and failed to deposit the remainder of the purchase price into the court clerk's fund.

49.   However, a warranty deed, allegedly signed by the Shorters on September 29, 2014, transferring their home to Showtech Distributors LLC was filed with the Oklahoma County Clerk's Office on October 3, 2014. This deed was notarized by Cheryl Ashley. A second warranty deed filed October 16, 2014, with the Oklahoma County Clerk's Office, transferred the Shorters' home from Showtech Distributors to Help and Hope LLC.

50.   On November 7, 2014, court records show Help and Hope LLC paid an additional $13,000 into the Court Clerk's fund. On November 12, 2014, Laura Johnson filed a "Certificate of Release" with the Court Clerk's office, that represented the judgment obtained through the foreclosure on the Shorters' property had been released by Judge

Bryan C. Dixon.  A copy of this document also was filed with the Oklahoma County Clerk's Office.

51.     On January 23, 2015, the mortgage company filed a motion to set aside the Certificate of Release as a sham legal process conducted by Laura Johnson.  On February 19, 2015, Laura Johnson filed an affidavit, as an authorized representative of Help and Hope LLC, admitting she had filed the Certificate of Release.  She asserted what occurred was just a misunderstanding of the process and not an attempt to commit a fraud. Additionally, she claimed the Shorters had given Help and Hope LLC, a Power of Attorney on January 1, 2014, to handle the payment of any claim held by a mortgage.  She also claimed Help and Hope LLC had a prior business and personal relationship with Joe Shorter.

52.     Oklahoma County District Court Judge Dixon set aside the Certificate of Service and ordered it expunged from the records of the Oklahoma County Clerk's Office. At a subsequent sheriff's sale, the property was sold for $75,100 to a different company.

## Ongoing Warranty Deed Fraud Activity

53.     I believe this warranty deed fraud is ongoing based upon a March 6, 2018, filing of a "corrected" warranty deed on the property of Jimmie G. Perkins at 5846 N. Mueller Avenue in Bethany.  Based upon public records, I believe Jimmie G. Perkins died on December 8, 2010.  The initial warranty deed, filed June 6, 2017, listed Perkins in Oklahoma County.  I believe individuals involved in this warranty deed fraud "corrected" the initial warranted deed because notary Christi S. Cina, whose signature and notary seal

appeared on the initial deed, filed a notice on June 14, 2017, stating that her signature on the deed was a forgery.

54.     The "corrected" warranty still transferred Perkins' property to OT LLC, however, it listed Perkins as being in Denton County, State of Texas. The name and seal of Texas notary Frankie Taylor appears on this "corrected" deed. After reviewing the "corrected" deed, Frankie Taylor told investigators she did not sign or notarize the deed.

55.     During the course of this investigation, I have discovered many similarities such as the use of forged and fictitious documents, forged signatures of property owners on documents, forged signatures and seals of notaries, the creation of what appear to be fictitious people and companies and the use of private postal boxes.   I believe many documents such as warranty and quit claim deeds, power of attorney forms, court pleadings, affidavits and even the Bartrug's Last Will and Testament, among other items used in this scheme are fraudulent and most likely were created on a computer.

56.     For instance, fictitious mortgages were filed on four properties taken over in this warranty deed scheme.   Three of the mortgages listed the mortgage holder as "The Texas Bank" while a fourth mortgage listed the mortgage holder as the "First National Texas Bank." The language in each of these mortgages is very similar.

57.     Based upon my examination of these documents, I believe a single mortgage document was created by individuals involved in this warranty deed fraud and then that document was altered each time a mortgage was filed on a different property.

58.     For instance, on June 12, 2017, a fictitious mortgage with "The Texas Bank" was filed on the home of Jennifer Riggs in Marshall County which had been fraudulently

taken over in this scheme. This document directed the Marshall County Clerk to mail the mortgage, after filing, to Duende Management LLC, at 12101 N. MacArthur #A271, Oklahoma City, Oklahoma. This is an UPS store that offers private postal boxes. This postal box was opened by Cheryl Ashley on May 14, 2015. The UPS agreement authorized the delivery of mail to the postal box on behalf of Nia Forte, Duende Management, Innovative Transformation, and Help and Hope LLC. The postal box application form listed Laura Johnson as an officer of the corporation.

59.     Two additional mortgages between "The Texas Bank" and Helping Hand LLC, were filed one minute apart in the Oklahoma County Clerk's Office on February 14, 2017. These mortgages were filed against the homes of Lucinda Giovanni and Justin Weems. The language in each of these documents is very similar to the mortgage filed against Riggs. This similarity even included the uncorrected language in the mortgages that Giovanni's and Weems' properties were located in Marshall County when in fact they are located in Oklahoma County.

60.     Finally, the mortgages filed against Giovanni's and Weems' properties listed the address for the Texas Bank as 5830 NW Expressway #178, Oklahoma City, Oklahoma, which is a private postal box opened June 27, 2017, by Cheryl Ashley. These two mortgages also had the forged signature and seal of notary Mitzi Norton on each document.

61.     This same mortgage form appears to have been used in the fraudulent filing of a mortgage between Rejuvenation, LLC and the First National Texas Bank on the home of Tony and Becky Hawkins at 13200 Cedar Bend Dr., in Oklahoma City. The mortgage form had been changed to show the location of the property as being in Oklahoma County

rather than Marshall County. The first page of the mortgage document correctly listed the address of the Hawkins' home as 13200 Cedar Bend Dr., Oklahoma City; however, the third page of the mortgage listed the property's address as being 10204 Major Ave., The Village, OK 73120 which is actually the street address for Lucinda Giovanni's home.

62.     During the course of this investigation, I have determined that some of the properties taken over or attempted to have been taken over have had the locks to the homes changed. Additionally property from within the homes had been removed and some repairs and/or renovations had been performed on the homes.

63.     During the course of this investigation, I have also determined that the names of a number of different entities and companies have been used on various documents involved in this warranty deed fraud. A number of the deeds and other documents filed with county officials appear to be signed by individuals as "managing members" of these entities. I have not been able to determine if the individuals, whose names appear on these documents, actually exist.

64.     During the course of this investigation, I have also determined that a number of documents filed of record in county offices in Oklahoma County and Marshall County were personally delivered by the participants in this warranty deed fraud as well as by a minor relative of the participants.

65.     During the course of this investigation, I have identified phone numbers used by participants in this warranty deed fraud including Cheryl Ashley's phone (405) 388-0683 and Laura R. Johnson phone (405) 641-4016. Additionally, I have learned that Laura

R. Johnson has obtained nine prepaid cellular phone numbers from AT&T. These phone numbers are in addition to the Verizon phone number opened in the name of Jewel Bartrug.

66.     During the course of this investigation, I have learned that documents filed with the Oklahoma County Clerk's Office such as warranty and quit claim deeds are electronically scanned and uploaded to a website that is accessible to the public through the Internet. Only employees of the Oklahoma County Clerk's Office and the Oklahoma County Assessor's Office have the ability to input documents into the system.

**PREMISES, COMPUTERS AND ELECTRONIC DEVICES TO BE SEARCHED**

67.     I seek a warrant to search the premises located at 7313 N.W. 125th Street, Oklahoma City, Oklahoma 73142. I know this to be the home of Cheryl Ashley and George Ashley based upon surveillance that I have conducted during the course of this investigation. I have also identified at the residence a red Toyota which is registered to Cheryl Ashley and George Ashley that I have surveilled on a number of occasions as George Ashley has driven Cheryl Ashley to her place of employment. I have also confirmed that utilities with City of Oklahoma City are in the name of the Ashleys.

68.     Based on my training and experience, I know that when individuals work together to commit financial crimes they commonly maintain addresses and telephone numbers of their associates to communicate with each other. This type of communication includes the use of cell phones, text messages, emails and other communication software.

69.     Based upon my training and experience, I know that complicated fraud cases routinely involve numerous records including receipts, correspondence, photographs,

phone records, email records, financial transactions, bank records, proceeds of criminal transactions and other documents related to the criminal activity and associates.

70.     Based on my training and experience, I know that records of such criminal activity are routinely maintained where the individuals involved have ready access to them in formats such as paper files as well as in electronic files and devices.

71.     Based on my training and experience, I know that individuals who commit financial crimes use electronic devices to maintain records related to the criminal activity and related to the distribution of proceeds derived from the fraudulent conduct including computer software and hardware, CDs, DVDs, thumb drives and other portable data storage.

72.     Based upon my training and experience, I know that the items sought in this search warrant are portable and of the type that could reasonably be located in a vehicle or storage trailer. Because a number fraudulent documents filed in this warranty deed fraud were delivered in person to county offices, I believe it is reasonable to believe that similar items sought in this application could be found in vehicles located at the premises.

73.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found such as paper records/documents, photographs and electronic records. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage

media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

74.    I submit that if a computer or storage medium is found on the PREMISES, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a.  Based on my training, experience and discussions with forensic examiners and others, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

    d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

75.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of

the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the PREMISES because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training, experience and discussions with forensics examiners, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.

Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user.   Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

24

f.  I know that when an individual uses a computer to create and store documents, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The computer is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

76.  *Necessity of seizing or copying entire computers or storage media.*  In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.  Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files.  Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.  This is true because of the following:

a.  Technical requirements.  Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.  Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.  The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

b. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

77. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

78. Because several people share the PREMISES as a residence, it is possible that the PREMISES will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime. If it is nonetheless determined that that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

## CONCLUSION

79. I submit that this affidavit supports probable cause for a warrant to search the premises described in Attachment A and seize the items described in Attachment B.


KIMBERLY CARTER

26

Special Agent
United States Secret Service


Subscribed and sworn to before me this _6th_ day of April, 2018.

GARY M. PURCELL
United States Magistrate Judge